UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERRENCE LONZELL WILLIAMS,

                Petitioner,

                                          Case Number 09-12125
v.                                        Honorable David M. Lawson

BONITA HOFFNER,

                Respondent.

_____/

## OPINION AND ORDER DENYING PETITION AND AMENDED PETITION FOR WRIT OF HABEAS CORPUS

A Wayne County, Michigan jury found that petitioner Terrence Lonzell Williams was responsible for a shooting in a Detroit, Michigan apartment building in July 2004, that left one person mortally wounded and another seriously injured. When the injured victim recovered, he identified Williams in a lineup as the shooter, and the police found a gun in Williams's possession that was tied ballistically to the shooting. Williams had an alibi and an excuse for possessing the gun, which he said he first acquired after the shooting had taken place. The competing evidence, while factually close (a previous jury was unable to reach a unanimous verdict), convinced the jury to return convictions of second-degree murder, assault, and a firearm violation, which Williams challenges in this habeas corpus proceeding brought under 28 U.S.C. § 2254.

Williams brings nine claims, contending that the state trial proceedings violated his federal constitutional rights. Warden Bonita Hoffner counters that the claims are not meritorious, and some of them were not presented properly to the state courts and for that reason should not be addressed here. After reviewing the state court records, the Court is convinced that Williams was treated fairly

and the state courts properly concluded that no constitutional violations occurred.  Therefore, the Court will deny Williams's petition and amended petition for a writ of habeas corpus.

I.

The shootings occurred in the early morning of July 6, 2004 at a known drug house on Springwells Street in Detroit, Michigan.  The victims were Bruce Tyler, Jr., who was killed, and Alfredo DeLeon, who suffered non-fatal but serious bullet wounds.  The petitioner was charged with first-degree, premeditated murder, assault with intent to commit murder, and possession of a firearm during the commission of a felony.  His first trial in the Wayne County, Michigan circuit court ended with a mistrial because the jury was unable to reach a unanimous verdict.

At the second trial in 2005, Alfredo DeLeon testified that during the early morning hours of July 6, 2004, he was leaving a meeting center for drug and alcohol users near the Springwells apartment complex in Detroit.  He knew several people who lived at the apartment complex and decided to visit one of his friends there, Bruce Tyler, before going home.  Tyler lived on the third floor of the locked building, so he tossed a key from the window down to DeLeon at the front door.  DeLeon let himself inside and went upstairs, visiting with Tyler for a short time.  Within an hour of his arrival, they heard a loud banging at the door.  The banging grew louder.  From the inside of the apartment they could hear voices outside, but decided not to answer the door.  Ultimately, the door was kicked in and three black males entered the apartment, one of whom pointed a gun at DeLeon as he and Tyler stood in the living room.  DeLeon believed it was a robbery and kept his hands up in the air while the gunman pointed the weapon at his head.  Although the gunman never said anything to DeLeon, as DeLeon tried to push the gun away from his face, the gunman snickered or smiled in a distinctive manner and shot DeLeon.  The bullet traveled through his hand and into

-2-

his nose before exiting the upper part of his mouth. DeLeon fell backwards onto the floor, bleeding profusely through his mouth.

Tyler was at the front door of the apartment when DeLeon heard another shot and then passed out. When he regained consciousness, he saw Tyler sitting at the door against the wall still alive but bleeding from a gunshot wound to the chest. Tyler opened the door for DeLeon, who said he was going to get help, but he did not come back. DeLeon went downstairs and began knocking on doors on the first floor until the apartment manager, Paul Sherlock, responded. Sherlock did not have a telephone, but assisted DeLeon to a payphone in the front of the building to call for help. When officers arrived, DeLeon directed them to the third floor apartment to assist Tyler.

Officer Earl Crutchfield, one of the first responders, discovered Tyler on the floor behind his apartment door that had been forced ajar. He knew Tyler from the neighborhood, having been on patrol in this heavy area of narcotics trafficking. Tyler was still alive; he gave a brief description to the officer's partner of three black males wearing black hoods. Tyler was having difficulty breathing and indicated that he was dying. He died as he was being transported out of the apartment building.

DeLeon was treated at Henry Ford Hospital for the gunshot wounds, which caused damage to his upper palate and face. The treating physician described DeLeon as alert, oriented, and cooperative, but anxious. He did not appear to be under the influence of drugs upon arrival to the hospital, but laboratory analysis of his blood and urine confirmed the presence of opiates, cocaine metabolites and tricyclits (sedatives), which were present upon admission and unrelated to the medicines administered by the hospital during the course of his treatment. DeLeon did not give an extensive amount of information to the officers during his stay at the hospital because it was difficult

to speak, and because he felt the tone of their questions was accusatory.  He did not initiate any contact with police after he was discharged from the hospital.

At the time of the incident, DeLeon had been a heroin user for approximately thirty years. He denied being in a drug induced state at the time of the shooting, but he had taken what he described as a "maintenance dose" at about 8:00 a.m. on July 5, 2004 as he did every day so as to prevent symptoms associated with drug withdrawal.

DeLeon was able to see the face of the gunman assisted by the light in the kitchen.  He positively identified the petitioner as the shooter at a live lineup a few months after the incident occurred and in Court during the trial proceedings.  He said he remembered the shooter's distinctive trait: a smile where one side of his mouth goes up while the other side goes down, although he did not note that description in his written statement.  DeLeon described the shooter as being slim, tall, dark-skinned and having a "nice set of teeth."  At the time of the incident, the shooter was wearing all black and a knit cap with an English-styled letter "D."  At the subsequent lineup, he recognized the shooter, but asked to have the man smile.  When the man smiled, Deleon said without any hesitation, "That's him."  At trial, DeLeon identified the petitioner as the man whom he picked at the lineup.

Dawn Meadows was at the Springwells apartment building during the early morning hours of July 6, 2004 to buy heroin from Bruce Tyler.  She did not remember seeing anyone else (including  DeLeon) in Tyler's third floor apartment when she was there.  She made her purchase, then went downstairs to Paul Sherlock's apartment on the first floor where she stayed for a period of time.  As she went to leave, she saw someone in the hallway that looked like "G-Rock," a drug dealer whom Ms. Meadows wanted to avoid because she owed him money for drugs.  She

immediately walked back into Sherlock's apartment.   At trial, Meadows wavered on her identification of the person as "G-Rock."  She explained that it would have been unusual to have seen "G-Rock" in the Springwells building, as he sold his drugs elsewhere.  When she was confident that the person in the hall was gone, Meadows left the building and did not go back that evening, even when she heard an ambulance heading for the apartment complex.

Michelle Namyslowski lived at the Springwells Apartment Building in July of 2004.  She had been in a relationship with Bruce Tyler several years earlier.  She had heard that Tyler sold drugs out of that Springwells Apartment and that DeLeon worked as his "doorman."  On the evening of July 5th around midnight, Namyslowski saw DeLeon and Tyler together, walking across the street and coming back to the apartment building.  Later, she was home sleeping in her first floor apartment when she heard DeLeon loudly beating on her door, yelling that Tyler had been shot and telling her to call 911.  She reluctantly opened the door and saw DeLeon and a trail of blood down the hallway leading from Sherlock's apartment.  Namyslowski did not see the shooter.  She left the building to pick up Tyler's father and bring him back to Springwells.

After the shooting, Namyslowski apparently spoke with Paul Sherlock, who described seeing someone within the time frame of the shooting who was known to visit another resident named "Sunshine."   As a result of this information, Namyslowski gave a description to the police. Namyslowski did not see "Sunshine's" friend that day, nor did she see "G-Rock" at the apartment that day.  Like Meadows, Namyslowski believed it would be unusual to see "G-Rock" in the apartment building.

Evidence collected from the apartment where the shooting occurred included three .380 Winchester shell casings from the foyer entrance inside the apartment and one fragmented copper-

-5-

jacketed bullet found in the living room area. A trail of blood was observed from Tyler's apartment to Paul Sherlock's apartment and a sample of blood was found on a shovel inside of Mr. Sherlock's apartment. However, the shovel was not taken by evidence technicians and the results of the blood sample were unknown. Fingerprint evidence was not recovered. Photographs of Tyler's apartment depicted a cap with blood on it, but which was not taken into evidence by technicians processing the scene of the crime.

The prosecution petitioned and obtained a court-ordered detainer to hold Paul Sherlock as a witness for trial at the May 25, 2005 pretrial conference. The detainer expired on June 23, 2005 (the next scheduled hearing) and was not renewed. Sherlock was personally served with a subpoena a week before trial, but was not held in the absence of a valid detainer. He did not appear for Court and efforts to find him were unsuccessful. Namyslowski testified that Sherlock lived in Apartment #1 at the time of the crime, but she believed that at the time of trial he was homeless. Sherlock was interviewed by police shortly after the shooting, which, according to the officer in charge, did not produce any "leads" as to the perpetrators. As a result of the description and information given regarding people visiting "Sunshine," officers investigated but came to the conclusion that she was not a witness to the crime.

Shortly after 4:00 a.m. on September 6, 2004, the petitioner was driving while intoxicated to Henry Ford Hospital in Detroit to check on an ill friend who had been taken to the hospital in an ambulance that morning. He was stopped by police for a traffic violation and arrested for drunk driving. When asked, the petitioner told officers that he had a weapon in the car for protection. He explained that he had been carjacked approximately four or five days earlier and obtained that

weapon in response to that event.  However, he also signed a written statement indicating that he got the gun a year before his arrest.

A firearms examiner testified at trial that the casings and bullet recovered from the apartment where the shooting occurred were fired by the weapon that was found in the petitioner's car when he was arrested on September 6, 2004.  After these comparisons were made, the petitioner was re-arrested at the end of October 2004 and placed in a lineup, where he was identified by DeLeon as the shooter.  The petitioner agreed to make a statement to the investigating officers in which he denied shooting anyone, but admitted he had the gun for the previous four or five months before he was arrested (at the end of October 2004).  He explained that he needed the gun for protection because he had recently been carjacked.

Defense witness Erika Lewis, the petitioner's former wife and mother to his three daughters, testified that the petitioner was with their children beginning at approximately 1 p.m. on July 5 until he dropped them back off at home where Lewis lived with her daughters and her parents at 2:00 a.m. on July 6.  She specifically remembered that occasion because of the holiday weekend, and that the 2:00 a.m. drop-off was unusual for the petitioner.  Her mother, Nancy Lewis, also remembered the occasion due to the holiday and the lateness of the hour of the return.

Erika Lewis admitted that she and the petitioner had rekindled their relationship around the time of his arrest in this case, but denied any willingness to lie for him.  Lewis acknowledged that she communicated with the petitioner by telephone from the jail in response to the prosecution's assertion that in excess of 200 conversations were recorded.  Over defense objection, the prosecution introduced evidence of a tape recorded telephone call between the petitioner and his ex-wife, recorded from a jail telephone call while the petitioner was in custody awaiting trial on April 20,

2005 at 6:30 p.m.  During the conversation, the petitioner asked Lewis to ensure that the defense witnesses (Anthony Maddox and Robert Williams) "get their stories straight."

The petitioner testified in his own defense and explained that he simply wanted the defense witnesses to testify without embellishment.  He explained that during the day of July 5 into the early morning hours of July 6, he was with his children, eating and playing.  He dropped off the girls with their mother at the Lewis house on Prevost in Detroit sometime between 1 and 2 a.m. then returned to his grandfather's home on Doris in Detroit to go to sleep.  The petitioner's Uncle Robert "Bobby" Williams (who also lived at the house on Doris) testified that he saw the petitioner when he (Uncle Bobby) went to sleep at midnight and that the petitioner was there when he (Uncle Bobby) awoke at approximately 4:30 a.m.

The petitioner explained that in October 2004, he pleaded guilty and was sentenced to probation for carrying a concealed weapon when he was stopped and arrested for traffic violations on September 6, 2004.  He said that he obtained the gun from a man named "Bobby" that he met through his longtime friend Anthony Maddox at a party on or about September 4, 2006.  He wanted the gun for protection, he said, after he and his girlfriend were the victims of an armed carjacking that occurred on August 31, 2004.

Anthony Maddox confirmed at trial that he introduced the petitioner to a person named "Bobby" that he knew was selling a gun.  Maddox was aware of the fact that the petitioner wanted a gun for protection after he was carjacked, so he introduced the petitioner to "Bobby" shortly after the incident.

The petitioner denied making any statements about having the gun for a year when he was arrested during the traffic stop on September 6, 2004.  He estimated that the time frame was closer

-8-

to two to three months that he was in possession of the weapon by the time he was arrested at the end of October 2004, and he was not thinking clearly when he wrote in his statement to Officer Lil Drew that he had the gun for approximately four to five months.  The petitioner denied ever being at the Springwells address, shooting anybody with the gun, and having any knowledge or anything to do with the crimes he was charged with.  The petitioner smiled for the jury when asked by both his attorneys and the prosecutor, but acknowledged during cross-examination that people can manipulate their smile or smiles in different ways.

The jury convicted the petitioner of the lesser crime of second-degree murder of  Bruce Tyler, Mich. Comp. Laws § 750.317, assault with intent to commit murder, Mich. Comp. Laws § 750.83, and possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b.  He was sentenced to concurrent prison terms of 30 to 60 years for murder and  20 to 40 years for assault, and a consecutive two-year term for the firearm violation.

On direct appeal, he argued that the prosecutor failed to produce an endorsed *res gestae* witness and discovery materials, that the trial court failed to give a missing-witness instruction and refused to inspect the contents of a police officer's folder, and that his trial attorneys were ineffective by failing to request a missing-witness jury instruction and a due diligence hearing on the missing witness.  At the petitioner's request, the Michigan Court of Appeals remanded the case to the trial court so that the petitioner could move for a new trial and an evidentiary hearing on his claim about trial counsel.  On remand, the state trial court conducted a hearing on the petitioner's ineffective-assistance-of-counsel claim and denied his motion for new trial.  The Michigan Court of Appeals subsequently affirmed the petitioner's conviction in an unpublished, *per curiam* decision. *People v. Williams,* No. 266084, 2007 WL 3408216  (Mich. Ct. App. Nov. 15, 2007).  The state

supreme court denied leave to appeal. *People v. Williams*, 480 Mich. 1137, 746 N.W.2d 74 (2008) (table).

On June 2, 2009, the petitioner commenced this action *pro se* by filing a combined habeas corpus petition and motion to stay the federal court proceedings. The habeas petition raised the same claims that the petitioner presented to the Michigan state courts on direct review, but the motion for a stay added a new claim that had not been presented to the state court. The new claim alleged that the Detroit crime laboratory's testing of firearm evidence may have been tainted and that re-testing could prove the petitioner was actually innocent. The petitioner stated that the Wayne County Prosecutor's Office had offered to review firearm evidence in any case processed by the Detroit crime lab, upon request by a defendant, and that the Michigan State Appellate Defender's Office had requested retesting in his case and filed a motion for relief from judgment on his behalf.

The Court granted the petitioner's motion to hold his habeas petition in abeyance. The State Appellate Defender's Office subsequently informed the petitioner that the firearm testing results were not favorable to him and that it was withdrawing the motion for relief from judgment that it had filed on his behalf. The petitioner then filed a *pro se* motion for relief from judgment in the state trial court. He alleged that he was not represented by counsel during a critical stage of the trial, that his appellate counsel was ineffective, and that his trial attorneys were ineffective for failing to (i) obtain or request appointment of an expert witness on eyewitness identification, (ii) file a motion *in limine* to challenge the reliability of the firearm examiner's testimony, (iii) obtain or seek appointment of a firearm expert, and (iv) investigate and discover that the pretrial identification procedures were unduly suggestive. The trial court denied the petitioner's motion after concluding that the petitioner's claims lacked merit and that he had failed to show cause for not raising the

issues on direct review, or prejudice. *People v. Williams*, No. 04-012592-01, Opinion & Order (Wayne Cty. Cir. Ct. June 2, 2011).

The petitioner appealed the trial court's decision, raising only the claims that appellate counsel was ineffective and that trial counsel was ineffective by failing to (i) present or seek appointment of an expert witness on eyewitness identification, (ii) file a motion *in limine* to challenge the reliability of the firearm examiner's testing methods, and (iii) investigate, obtain, and present a defense expert witness on firearms. The Michigan Court of Appeals denied leave to appeal, *People v. Williams*, No. 310538 (Mich. Ct. App. May 7, 2013), as did the state supreme court, *People v. Williams*, 495 Mich. 900, 839 N.W.2d 467 (2013) (table).

On January 13, 2014, the petitioner returned to this Court with an amended petition for writ of habeas corpus and a motion to lift the stay and re-open his case. His petition and amended petition raise these claims:

> I.  THE PROSECUTOR COMMITTED MISCONDUCT AND DENIED MR. WILLIAMS A FAIR TRIAL BY VIOLATING HER DUTY TO PRODUCE AN ENDORSED, *RES GESTAE* WITNESS AND BY FAILING TO PROVIDE DISCOVERY MATERIALS TO THE DEFENSE PRIOR TO TRIAL.

> II. THE TRIAL COURT ERRED BY FAILING TO GIVE THE "MISSING WITNESS" INSTRUCTION TO THE JURY AND BY FAILING TO MAKE AN IN CAMERA INSPECTION OF ITEMS DEEMED NOT DISCOVERABLE BY THE PROSECUTOR, WHICH COMPROMISED THE [PETITIONER]'S RIGHT TO PRESENT A DEFENSE AT TRIAL.

> III. [THE PETITIONER] DID NOT RECEIVE THE EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL WHERE COUNSEL FAILED TO FORMALLY REQUEST A DUE DILIGENCE HEARING AND FAILED TO REQUEST THAT THE MISSING WITNESS INSTRUCTION BE GIVEN TO THE JURY AT THE CONCLUSION OF TRIAL.

IV.     MR. WILLIAMS IS ENTITLED TO RELIEF FROM JUDGMENT
        BECAUSE HE WAS DENIED HIS RIGHT TO THE EFFECTIVE
        ASSISTANCE OF COUNSEL ON HIS DIRECT APPEAL.

V.      MR. WILLIAMS IS ENTITLED TO RELIEF FROM JUDGMENT WHERE
        HE WAS DENIED A FAIR TRIAL AND HIS CONSTITUTIONAL RIGHT
        TO THE EFFECTIVE ASSISTANCE OF COUNSEL BY HIS
        ATTORNEY'S FAILURE TO REQUEST OR OBTAIN THE
        APPOINTMENT OF AN EXPERT ON EYEWITNESS IDENTIFICATION.

VI.     MR. WILLIAMS IS ENTITLED TO RELIEF FROM JUDGMENT WHERE
        HE WAS DENIED A FAIR TRIAL AND HIS CONSTITUTIONAL RIGHT
        TO THE EFFECTIVE ASSISTANCE OF COUNSEL BY HIS
        ATTORNEY'S FAILURE TO FILE A MOTION *IN LIMINE* TO
        CHALLENGE THE RELIABILITY OF THE FIREARM EXAMINER'S
        TESTIMONY ON BOTH STATE AND FEDERAL GROUNDS,
        THEREBY, ALLOWING UNRELIABLE TOOL MARKING EVIDENCE
        TO GO UNCHALLENGED AND THEREFORE LINKING MR.
        WILLIAMS TO THE SHOOTINGS BY IDENTIFYING THE GUN HE
        POSSESSED AS THE MURDER WEAPON.

VII.    MR. WILLIAMS IS ENTITLED TO RELIEF FROM JUDGMENT WHERE
        HE WAS DENIED A FAIR TRIAL AND HIS CONSTITUTIONAL RIGHT
        TO THE EFFECTIVE ASSISTANCE OF COUNSEL BY HIS
        ATTORNEY'S FAILURE TO REQUEST OR OBTAIN THE
        APPOINTMENT OF AN FIREARM EXPERT FOR THE DEFENSE.

VIII.   MR. WILLIAMS IS ENTITLED TO RELIEF FROM JUDGMENT WHERE
        HE DID NOT HAVE ANY REPRESENTATION DURING THE
        ALLEGATIONS OF A DELIBERATING JUROR MISCONDUCT WHEN
        HIS RETAINED COUNSEL WAS ABSENT FROM THE COURTROOM
        AND THAT HE DID NOT KNOWINGLY AND INTELLIGENTLY
        ACCEPT SUBSTITUTE COUNSEL DURING THIS CRITICAL STAGE
        OF TRIAL WHERE HIS CONSTITUTIONAL RIGHT TO A FAIR AND
        IMPARTIAL TRIAL WERE BEING DECIDED.

IX.     MR. WILLIAMS IS ENTITLED TO RELIEF FROM JUDGMENT
        BECAUSE HE WAS DENIED HIS RIGHT TO THE EFFECTIVE
        ASSISTANCE OF COUNSEL WHERE HIS DEFENSE ATTORNEY
        FAILED TO INVESTIGATE AND DISCOVER THAT THE PRETRIAL
        IDENTIFICATION PROCEDURES WERE UNDULY SUGGESTIVE,
        THUS, HIS DEFENSE ATTORNEY COULD NOT MOVE TO EXCLUDE
        THE VICTIM'S PRETRIAL IDENTIFICATION OF MR. WILLIAMS AS
        THE SUSPECT FROM COMING IN AT HIS TRIAL.

Claims one, two, and three were raised on direct appeal in the state courts. Claims four, five, six, and seven were raised in the post-conviction motion and presented to the state appellate courts. Claims eight and nine were raised only in the petitioner's motion for relief from judgment.

As noted above, Warden Hoffner contends in her response to the petitions that the claims presented to the state courts in the post-conviction motion are procedurally defaulted. The "procedural default" argument is a reference to the rule that the petitioner did not preserve properly some of his claims in state court, and the state court's denial of those claims on that basis is an adequate and independent ground for the denial of relief under state law, which is not reviewable here. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The Court finds it unnecessary to address this procedural question. It is not a jurisdictional bar to review of the merits, *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), and "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits," *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). The procedural defense will not affect the outcome of this case, and it is more efficient to proceed directly to the merits.

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). Because Williams filed his petition after the AEDPA's effective date, its standard of review applies. Under that statute, if a claim was adjudicated on the

-13-

merits in state court, a federal court may grant relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions." *White v. Woodall*, --- U.S. ---, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. The AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be "given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (finding that the state court's rapid declaration of a mistrial on grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached" (internal quotation marks and citations omitted)); *see also Dewald v. Wriggelsworth*, 748 F.3d 295, 298-99 (6th Cir. 2014);

-14-

*Bray v. Andrews*, 640 F.3d 731, 737-39 (6th Cir. 2011); *Phillips v. Bradshaw*, 607 F.3d 199, 205 (6th Cir. 2010); *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *Rockwell v. Yukins*, 341 F.3d 507, 511 (6th Cir. 2003) (en banc).  Moreover, habeas review is "limited to the record that was before the state court."  *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).

## A.

In his first claim, the petitioner alleges that the prosecutor committed misconduct and deprived him of a fair trial when she did not produce an endorsed *res gestae* witness and failed to provide the defense with discovery materials before trial.  The Michigan Court of Appeals adjudicated this claim on the merits and rejected it.

The *res gestae* witness that the petitioner believes the prosecutor should have produced was Paul Sherlock, one of the residents of the apartment building where the shootings occurred.  The Michigan Court of Appeals stated on review of this claim that the prosecution complied with the requirements of the state statute on producing *res gestae* witnesses and the failure to produce Sherlock did not deprive the petitioner of a fair trial because there was nothing in the record to show how Sherlock could have added any information that was not already part of the record.

Because the petitioner did not file a brief supporting either of his habeas petitions, the Court has considered the briefs filed in state court for a fuller explanation of his claims.  There, the petitioner conceded that prosecutors no longer have a duty under state law to produce all *res gestae* witnesses at trial, but only to keep the defendant informed of such witnesses and furnish assistance in producing them, if asked.  The petitioner argues nevertheless that the prosecutor had a duty to

-15-

provide reasonable assistance to locate and serve process on witnesses that she intended to produce at trial and to exercise due diligence in producing the witnesses.

Michigan Compiled Laws § 767.40a(5) requires prosecutors to provide a defendant (or his lawyer) with reasonable assistance in locating and serving process on a witness.  But the prosecutor's alleged failure to comply with § 767.40a(5) does not support habeas relief because "[a] federal court may not issue the writ [of habeas corpus] on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties *of the United States*." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (emphasis added).

The petitioner's claim that the prosecutor deprived him of a fair trial by failing to produce Paul Sherlock also lacks merit.  The petitioner maintains that the prosecution's efforts fell far short of the "due diligence" or "reasonable assistance" that state law requires of prosecutors.  Under Michigan law, "[d]ue diligence means doing everything reasonable, not everything possible." *People v. Sullivan*, 97 Mich. App. 488, 493; 296 N.W.2d 81, 84 (1980).  Detective Drew testified at trial that he had some difficulty finding Sherlock because Sherlock was homeless.  Although he eventually found Sherlock, served him with a subpoena, and took him into custody on a witness detainer, his detainer expired, and he did not know Sherlock's current location.  Detective Drew could have requested another detainer, but he was not persuaded that he could detain Sherlock until he testified.  In light of this testimony, the Michigan Court of Appeals reasonably concluded that the prosecution complied with the statute on *res gestae* witnesses.

Furthermore, Sherlock was not a suspect in the shootings or even a witness to the shootings. The police found a shovel with a few drops of blood on it in Sherlock's apartment, but there was no

-16-

evidence that a shovel was involved in the crime.  The victims were shot with a gun, and the blood on the shovel in Sherlock's apartment was consistent with DeLeon's testimony that, after he was shot, he started bleeding and went to Sherlock's apartment for help.  And even though Sherlock apparently gave the police a description of two people, Detective Drew testified that he got no leads from Sherlock.

The petitioner's right to a fair trial was not violated, and the Michigan Court of Appeals reasonably concluded that Sherlock's testimony would not have had any real effect on the trial's outcome even if he had been produced.  Habeas relief is not warranted on the petitioner's claim about the prosecution's failure to produce Paul Sherlock.

The petitioner also contends in claim I that the prosecution failed to produce discovery material, including  police activity logs and photographs taken at the crime scene immediately after the murder.  According to the petitioner, the photographs depicted a cap with blood on it and a jacket.  The Michigan Court of Appeals stated on review of this claim that the Michigan Court Rules did not require the prosecutor to provide the defense with photographs.  The court of appeals also stated that the photographs were not exculpatory and that the trial court did not abuse its discretion when resolving the issue by receiving the photographs, which were given to defense counsel half way through the second trial.

Any failure to comply with a state court rule to produce discovery materials is not a basis for habeas relief because it is not a constitutional violation.  *Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002).  The Supreme Court, moreover, has said that "[t]here is no general constitutional right to discovery in a criminal case," *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977), and that "the Due Process Clause has little to say regarding the amount of discovery which the parties must

be afforded." *Wardius v. Oregon*, 412 U.S. 470, 474 (1973). And because the only claim is that the prosecution should have provided the defense with discovery materials (and not that the materials were exculpatory in any way), the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963), is not implicated here. *Weatherford*, 429 U.S. at 559-60.

The petitioner's right to a fair trial also was not violated. The police activity logs were insignificant because several police officers testified at trial about their activities, and any officers who were briefly involved in the case, but did not testify, apparently had nothing significant to report. Photographs of the cap and jacket, moreover, were produced during trial, described by Officer Fitzhugh, and entered as exhibits.

The petitioner contends that the photographs could have been presented to DeLeon for the purpose of asking him whether the suspects wore the items depicted in the photographs. But the petitioner has not explained how that would have helped the defense, and he concedes it is purely speculative to guess what information Paul Sherlock would have provided if he were shown the photographs. The Michigan Court of Appeals therefore reasonably concluded that the photographs were not exculpatory. The failure to turn over the photographs and activity logs before trial did not prejudice the petitioner or deprive him of a fair trial.

### B.

In claim II, the petitioner alleges that the trial court erred when it failed to hold a formal due diligence hearing, give a missing-witness jury instruction, and make an *in camera* inspection of items that the prosecutor deemed not discoverable. The missing witness was Paul Sherlock, and the item deemed not discoverable by the prosecutor was a police officer's folder that contained paperwork about someone named "Sunshine," who lived in the apartment building where the

-18-

shootings occurred. The petitioner contends that the trial court's rulings and omissions deprived him of his constitutional right to present a defense.

The Michigan Court of Appeals rejected the petitioner's claims on the merits. The court of appeals concluded that it would not have been proper for the trial court to read a missing witness jury instruction because Sherlock was not a *res gestae* witness and the prosecution was not obligated to produce him. The court of appeals also stated that the trial court did not abuse its discretion by refusing to conduct an *in camera* review of the police officer's folder. The court of appeals noted that the petitioner failed to establish a reasonable probability that anything in the file would have been useful to his defense.

Under state law, if the prosecution fails to produce an endorsed witness and the trial court determines that the prosecution failed to show due diligence in producing the witness, a trial court may instruct the jury that the missing witness's testimony would have been unfavorable to the prosecution's case. *People v. Eccles*, 260 Mich. App. 379, 388; 677 N.W.2d 76, 83 (2004). Once again, though, the Supreme Court has "stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" *McGuire*, 502 U.S. at 67 (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).

Furthermore, a formal due diligence hearing was unnecessary, as there was testimony during trial regarding the prosecution's efforts to locate Sherlock. And because the prosecution showed due diligence in trying to produce Sherlock, the petitioner was not entitled to a missing witness jury instruction. Finally, the petitioner's right to present a defense was not violated by the lack of a missing-witness instruction because Sherlock was not a witness to the crime, and the defense

-19-

attorneys were able to elicit testimony regarding Sherlock's description of men he had seen at the apartment building.

The petitioner also alleges that the trial court should have made an *in camera* inspection of Detective Drew's folder on "Sunshine." This issue arose when defense counsel asked Detective Drew what Sunshine's real name was. Detective Drew then referred to a folder or file and apparently determined that Sunshine's real name was Marilyn Ann Wilkinson. Defense counsel claimed that he had a right to see what Detective Drew was using to refresh his memory, but the trial court disagreed, and when defense counsel asked the trial court to review the folder *in camera,* the trial court refused counsel's request.

State law tends to support the petitioner's position. *See* Mich. R. Evid. 612(a) ("If, while testifying, a witness uses a writing or object to refresh memory, an adverse party is entitled to have the writing or object produced at the trial . . . ."); *id.* 612(c) ("A party entitled to have a writing or object produced under this rule is entitled to inspect it, to cross-examine the witness thereon, and to introduce [it] in evidence . . . ."). But like his other claims noted above, this one also is based on a state law error, and as such, his claim is not cognizable on habeas review. *McGuire*, 502 U.S. at 67-68. It also lacks merit. *See Collins v. Perini*, 594 F.2d 592, 593-94 (6th Cir. 1979) (finding no merit in a habeas petitioner's claim that he was denied due process when the state court failed to conduct an *in camera* inspection of certain police documents).

Finally, although the petitioner states in the heading to his second claim that the trial court's omissions compromised his right to present a defense, Detective Drew testified that he did not take a statement from Ms. Wilkinson, that she was not a witness to the crime, and that she could only tell him what she heard from other people on the day after the crime. Detective Drew also stated that

-20-

he did not gain any information from his conversation with Ms. Wilkinson and that she did not lead him to any other witnesses or any suspects. He explained that he referred to his folder on Ms. Wilkinson for the sole purpose of answering defense counsel's question about "Sunshine's" real name. For these reasons, the lack of an *in camera* inspection of Detective Drew's folder did not compromise the petitioner's right to present a defense, and the state courts' decisions did not contravene or unreasonably apply federal law.

C.

In claim III, the petitioner alleges that trial counsel was ineffective by failing to request a formal due diligence hearing regarding Paul Sherlock, the missing witness, and by failing to ask the trial court to give the missing-witness jury instruction. The Michigan Court of Appeals stated on review of this claim that it would not second-guess defense counsel's reasoned decisions on the issues.

A violation of the Sixth Amendment right to effective assistance of counsel is established when an attorney's performance was deficient and the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at

-21-

688) (internal quotation marks omitted).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. Unless a defendant demonstrates both deficient performance and prejudice, "it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable." *Id*. at 687.

Success on ineffective-assistance-of-counsel claims is relatively rare, because the standard for obtaining habeas corpus relief is "'difficult to meet.'" *White v. Woodall*, 572 U.S. ---, ---, 134 S. Ct. 1697, 1702 (2014) (quoting *Metrish v. Lancaster*, 569 U.S. ---, ---, 133 S. Ct. 1781, 1786 (2013)). The standard is "all the more difficult" on habeas corpus review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (citations and quotation marks omitted). "[T]he question is not whether counsel' actions were reasonable," but whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*.

On the claimed failure to request a due diligence hearing on missing witness Paul Sherlock, defense counsel stated at one point during trial that he needed such a hearing, but he did follow through on that remark by formally asking for a hearing on the prosecution's efforts to locate Sherlock. He did, however, question the officer in charge of the case about his efforts to find Sherlock. The petitioner has not explained how deferring those questions to the time of trial constituted deficient performance, and this Court does not find it so.

-22-

It also appears from the record that the trial court would have determined that the prosecution exercised due diligence in trying to locate Sherlock. As noted above, Detective Drew testified that Sherlock was homeless, that he served Sherlock with a subpoena, and that he did not think he could detain Sherlock until he testified. Additionally, Sherlock apparently agreed to meet the police at a certain location, but failed to show up. The prosecutor maintained that they had gone to great lengths to produce Sherlock and that they could show due diligence. Because the trial court in all likelihood would have determined that the prosecution exercised due diligence, counsel's omission did not prejudice the defense.

Defense counsel's failure to request a missing-witness jury instruction concerning Sherlock did not constitute deficient performance because the instruction was not warranted where the prosecution exercised due diligence in trying to produce Sherlock. In fact, both defense attorneys testified at the post-conviction hearing in state court that they thought the police had exercised due diligence in trying to produce Sherlock and that there was no basis for requesting a missing-witness jury instruction. The Michigan Court of Appeals reasonably concluded that the petitioner's trial attorneys were not ineffective.

## D.

In claim V, the petitioner contends that trial counsel was ineffective by failing to obtain or request appointment of an expert witness on eyewitness identification. According to the petitioner, a defense expert witness on identification could have pointed out that extreme stress and the use of a firearm during a crime have a negative impact on a witness's ability to identify a suspect and that there is little correlation between a witness's confidence in his identification and the accuracy of his

identification.  The state trial court addressed the petitioner's claim on post-conviction review and found no merit in it.

The Supreme Court has stated that, although it can be assumed in some cases that counsel was ineffective by failing to consult or rely on experts, there are "'countless ways to provide effective assistance in any given case,'" and "'[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'  Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Richter*, 562 U.S. at 106 (quoting *Strickland*, 466 U.S. at 689).

In this case, the identification issue was not a complicated or technical one, and the petitioner's attorney thoroughly cross-examined DeLeon and Detective Drew about the lineup and DeLeon's identification of the petitioner as the shooter.  Adopting this approach instead of relying on an expert witness did not amount to ineffective assistance, particularly because DeLeon had a good opportunity to view the shooter and was unwavering in his identification of the petitioner. Decisions as to what evidence to present and whether to call certain witnesses are generally presumed to be a matter of trial strategy, although such decisions must be reasonable.  *See Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).  The decision not to call witnesses or present other evidence may constitute ineffective assistance of counsel only when it deprives a defendant of a substantial defense. *See Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).  No such deprivation occurred here, and no constitutional violation resulted.

### E.

In claim VI, the petitioner argues that trial counsel was ineffective by failing to file a motion *in limine* challenging the reliability of the firearm examiner's testing, and in claim VII, the petitioner

-24-

alleges that trial counsel was ineffective by failing to obtain an expert witness on firearms. The petitioner contends that the firearm examiner's testimony linking casings at the crime scene to the petitioner's gun was unreliable because it was unsupported by photographic documentation and peer review, and an expert witness could have countered the examiner's findings and testimony.

Defense counsel conducted a lengthy cross-examination of the firearm examiner at trial, and it does not appear that there was a substantial basis for challenging the firearm examiner's testing procedures in a pretrial motion or for obtaining an expert witness on firearms. Once again, however, decisions such as these fall into the category of trial strategy. Trial counsel's strategic decisions are entitled to deference however, and reviewing courts will not second-guess counsel's strategic decisions as long as those decisions are reasonable. *Strickland*, 466 U.S. at 490. The decision was reasonable here. The firearm examiner had twenty years of experience with the Detroit Police Department's crime lab, and even before he examined the firearm evidence, there was a preliminary computer analysis which indicated that the casings in evidence matched the petitioner's gun. Additionally, after the trial, the Michigan State Police reviewed the firearm evidence and found no irregularities in the firearm examiner's findings. Therefore, the lack of a pretrial challenge to the firearm examiner's findings and the decision not to obtain a firearm expert did not amount to ineffective assistance.

F.

In claim VIII, the petitioner alleges that he was not represented by his retained counsel of choice at a critical stage of the trial. This claim arose when a juror who was dismissed as an alternate returned to court and informed the trial court while the jury was still deliberating that one of the sitting jurors had reeked of alcohol on several occasions and had fallen asleep during the

-25-

petitioner's testimony.  The attorneys determined that no action should be taken at that point in the trial.

Under Supreme Court precedents, "once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009).  It is questionable whether the brief conversation that the trial court had with the dismissed alternate juror and the attorneys was a critical stage of the proceedings.  *See, e.g., Washington v. United States*, 291 F. Supp. 2d 418, 440-41 (W.D. Va. 2003) (concluding that a trial court's *ex parte* meeting with a juror after the juror had been designated as an alternate was not a critical stage of the prosecution).  Even assuming that it was a critical stage, the state trial court correctly pointed out on post-conviction review that the petitioner was represented by substitute counsel during the incident in question.

Although the petitioner retained his trial attorneys and had a right to retained counsel of choice, *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146-48 (2006), he did not object on the record to the substitution of counsel.  Furthermore, his claim is based on a temporary and very brief substitution of an attorney for his retained attorneys of choice, who apparently were unavailable. "The inconvenience of having substitute counsel stand in for a brief moment is in no way comparable to the complete denial of one's chosen counsel for the entirety of litigation." *Moritz v. Lafler*, 525 F. App'x 277, 287 (6th Cir. 2013).  Consequently, the determination that there was no Sixth Amendment violation flowing from this development was not unreasonable.

## G.

In claim IX, the petitioner alleges that trial counsel was ineffective by failing to investigate and discover that the pretrial identification procedure was unduly suggestive.  An identification

-26-

procedure violates due process of law if the confrontation was "'unnecessarily suggestive and conducive to irreparable mistaken identification.'" *Neil v. Biggers,* 409 U.S. 188, 196 (1972) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967)). Here, however, there is no indication in the record that the pretrial identification procedure was suggestive or conducive to irreparable mistaken identification. The petitioner and four other men were seated in a lineup so that their height would be about the same, and all the men were wearing some sort of cap or hat, because DeLeon had informed the police that the shooter was wearing a hat. In addition, a defense attorney was present to ensure the fairness of the lineup.

The petitioner bases his claim on the fact that DeLeon first described the shooter to the police three-and-a-half months after the shooting and that DeLeon observed the lineup four days after giving his description. The petitioner also points out that the description DeLeon gave of a tall, slim black male with a good set of teeth did not mention the suspect's distinctive smile, which was a characteristic that DeLeon mentioned at trial. But these factors (the late description of the suspect and the failure to mention a facial characteristic) say nothing about the suggestiveness of the actual lineup. Rather, they are relevant to the credibility of DeLeon's identification of the petitioner, and that point was explored fully by defense counsel on cross-examination.

Furthermore, the petitioner incorrectly alleges that DeLeon did not positively identify him at the lineup. The lineup officer, Detective Drew, wrote "POSS" on the lineup sheet, and the petitioner interprets this to mean that DeLeon made a "possible" identification. Detective Drew, however, testified at trial that his abbreviation meant that DeLeon "positively" identified the petitioner. and Deleon denied saying that the petitioner was "possibly" the shooter.

-27-

The petitioner has not shown that the pretrial procedure was suggestive.  Consequently, trial counsel was not ineffective by failing to challenge the procedure.

## H.

In claim IV, the petitioner contends that appellate counsel was constitutionally ineffective because he failed to raise on direct appeal the five issues litigated in the post-conviction motion, all discussed above.  To demonstrate that appellate counsel was ineffective, a habeas petitioner must (1) show that his attorney acted unreasonably in failing to discover and raise nonfrivolous issues on appeal and (2) demonstrate a reasonable probability that he would have prevailed on appeal if his appellate attorney had raised the issue.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

As discussed, claims V through IX lack merit, and it is unlikely that had they been raised on direct appeal, they would have afforded the petitioner any relief.  "Appellate counsel cannot be found to be ineffective for 'failure to raise an issue that lacks merit.'"  *Shaneberger v. Jones*,  615 F.3d 448, 452 (6th Cir. 2010) (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)).  The petitioner is not entitled to habeas relief on this claim.

## III.

The state courts' decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts.  The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the original and amended petitions for a writ of habeas

corpus [dkt #1, 4] are **DENIED.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   December 9, 2016

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on December 9, 2016.

s/Susan Pinkowski
SUSAN PINKOWSKI

-29-